THE PEOPLE OF THE STATE OF NEW YORK on the Complaint of ROY WALLER, Plaintiff, *v.* JACOB BRANFMAN & SON, INC., Defendant.

THE PEOPLE OF THE STATE OF NEW YORK on the Complaint of ROY WALLER, Plaintiff, *v.* BEN BRANFMAN, Defendant.

City Magistrate's Court of the City of New York, Third District, Borough of Manhattan, April 19, 1933.

*Thomas C. T. Crain, District Attorney [William Goldman, Deputy Assistant District Attorney, of counsel], for the plaintiff.*

*Kopp, Markewich & Null [Samuel Markewich of counsel], for the defendants.*

GOLDSTEIN, J. Jacob Branfman & Son, Inc., is a domestic corporation, and Ben Branfman its secretary and treasurer. The corporation conducts a provision factory and retail establishment at 178 Delancey street, in the city and county of New York.

The defendants are charged with exposing for sale non-kosher meat in violation of that portion of section 435-a of the Penal Law which reads: " a person who with intent to defraud * * * exposes for sale in the same place of business both kosher and non-

kosher meat or meat preparations, either raw or prepared for human consumption, who fails to indicate on his window signs and all display advertising, in block letters at least four inches in height, ' kosher and non-kosher meat sold here;' or who exposes for sale in any show window or place of business both kosher and non-kosher meat or meat preparations, either raw or prepared for human consumption, who fails to display over each kind of meat or meat preparation so exposed a sign in block letters at least four inches in height reading ' kosher meat,' or ' non-kosher meat,' as the case may be is guilty of a misdemeanor."

The purpose of this statute, the constitutionality of which was upheld both by the Court of Appeals and the United States Supreme Court, is clearly set forth by Judge LAUGHLIN in *People* v. *Atlas* (183 App. Div. 595, 596): " It appears that orthodox Jews are limited by their religion with respect to animal food, and are forbidden to partake of meat unless it has been slaughtered and prepared in accordance with the requirements of their religion, and that to this end, in certain slaughter houses animals are selected and slaughtered by and under the supervision of rabbis in accordance with the Jewish religious requirements, and then the meat is marked or labeled to indicate that it has been so slaughtered. Such meat is selected with great care and especial cleanliness is observed in the slaughter thereof, from which a reasonable inference follows that it is of superior quality  *  *  *

" It may be that those principally interested in the subject matter of the legislation are of the Jewish faith, but the benefits of the statute are not confined to them, for it is evident that others of the general public may be interested in knowing that greater care and cleanliness have been observed in the selection and slaughter of the animals the meat of which is so known, marked or labeled, than is otherwise exercised."

The place of business of the defendants had large signs prominently displaying the word " kosher;" in fact, the defendant corporation has built up a large business for the manufacture and sale of kosher meat products. The record establishes and the fact is that the defendants purported to manufacture and deal in kosher products exclusively.

The public at large, Jew and Christian alike, had a right to rely on the representations and signs of the defendant corporation that only kosher meat products were manufactured and sold by the defendant corporation. For the defendant corporation to sell or expose for sale non-kosher meat at their place of business, 178 Delancey street, New York city, would not alone be a violation of the Penal Law, but would be a fraud on the public.

It was conceded by the defendants at the hearing that there were no signs indicating that non-kosher meat was handled by them, and there was proof beyond a reasonable doubt that the meat which is the basis of this charge was non-kosher.

It was testified and the fact is that kosher meat has a certifying metal tag (called a *blumba*) attached to the meat. The meat in question had no *blumba*. It was testified and the fact is that kosher meat must be fresh. The meat in question was not fresh. It was testified and the fact is that to entitle meat to be received and known as kosher, requires the personal supervision of a *mashgiach*, *i. e.*, a qualified supervisor designated by rabbinical authority to supervise the receipt and handling of the meat. The facts established indicate beyond a reasonable doubt that the meat in question was delivered surreptitiously after hours, in the absence of the *mashgiach*. The fact is, as stated by Judge LAUGHLIN, that meat, to be kosher, requires " especial cleanliness." The proof shows that the meat in question came from a basement at 344 East Twenty-first street, New York city, that was very unsanitary.

" The floors of the premises in this store were encrusted with fat and dirt. The walls were wainscoted half way up and above that were covered with paper, dirty and encrusted with dirt, and the wall paper was falling off."

The sole contention raised on behalf of the defendants is that the evidence fails to establish that the meat was *exposed for sale*. The defendants contend that possession of the non-kosher meat in question does not constitute an exposure for sale within the meaning of the statute.

In the determination of this crucial point it is important briefly to relate the facts:

The defendant corporation occupied the entire building at 178 Delancey street as a factory and store for the manufacture and sale of kosher meat products.

In the afternoon of March 22, 1933, a white-painted truck, bearing the name of Branfman, with the slogan " The Name Deserves the Fame," drove up to Twenty-first street, east of First avenue. The driver of the truck transferred a number of empty barrels to a green truck that did not bear the name of Branfman, which proceeded to 344 East Twenty-first street; the barrels were delivered to the basement in which was located a meat cutting and trimming establishment. Dr. Roy Waller, of the board of health, had been stationed in an apartment opposite 344 East Twenty-first street, where he was watching the premises through binoculars. In the evening of the same day, thirteen barrels taken from 344

East Twenty-first street containing the meat in question were placed on a motor truck. The name of Branfman on the truck and the trade slogan was covered over by a specially prepared oilcloth flap, which fastened over the name, and which bore the words, " Rented from S. & E. Motor Hire Corporation, 520 West 20th Street, New York, Commercial Automobile Rentals." Before the truck reached the defendants' place at 178 Delancey street, the superimposed sign of the S. & E. Motor Hire Corporation was removed, folded, placed on the driver's seat, and the truck proceeded to the defendants' place of business. The truck reached the defendants' place at eight-thirty P. M. The *mashgiach*, in accordance with his custom, had left at five P. M. The driveway to the receiving department of the defendants' place of business was so constructed that no one could enter during the time that the truck was backed up to the unloading platform. The truck had been trailed from the time the thirteen barrels of meat were loaded at 344 East Twenty-first street to the time the barrels were unloaded at the defendants' place of business. The truck had been kept under constant observation by a party consisting of two city department of health employees, three Federal Department of Agriculture operatives, and two orthodox rabbis.

The brakes of the truck were released by a government agent and the truck moved so as to permit the raiding party to enter the receiving department. The defendant Ben Branfman, secretary and treasurer of the defendant corporation, was present, supervising the receipt of the thirteen barrels containing non-kosher briskets of beef. The testimony then discloses the following facts: The barrels containing the meat bore Branfman tags. The United States government indelible stamps on nearly all the briskets of beef which would identify the source of supply were cut away. There were no kosher tags on any of the meats. The driver, after receiving a warning in Yiddish from Ben Branfman, attempted to make the explanation that the meat was going to cold storage on Horatio street, that he had had a breakdown of his automobile, repaired it, found it was too late to go to storage, and was returning the meat to Branfman's. In the light of the testimony of government and rabbinical witnesses, this explanation is clearly false.

The facts thus briefly summarized patently indicate that the unsanitary and dirty place at 344 East Twenty-first street was used for the illicit preparation of meat to be used by Branfman. The use of the oilcloth flaps to cover the name of the truck, and the removal of these flaps, as well as the delivery of the meat at eight-thirty at night, without the presence of a *mashgiach*, together with the cutting away of the government stamps of identification, and

all the other facts and circumstances, establish beyond a reasonable doubt that these were non-kosher meats, and were Branfman's meats, brought to his " kosher " factory, there to be processed and illegally sold as kosher.

*Exposed for sale* does not mean that the meat must be physically exhibited to the buyer. The following decisions are decisive of this important issue:

In the case of *People* v. *Lewis* (138 App. Div. 673, 675) the court said, in construing sections 164 and 165 of the Agricultural Law: " The statute makes it an offense to ' offer or expose ' for sale as well as to sell adulterated or misbranded food. The complaint charges both the exposure for sale and the sale. The exposure in violation of the statute consists in having the adulterated or misbranded article in stock for the purposes of sale without actually making such sale."

Counsel for the defendants contends that the case of *People* v. *Lewis* and all other cited cases determined under the Agricultural Law are not controlling because of section 7 of that law, which reads: " Any person who shall keep, store or display any article or product, the manufacture or sale of which is prohibited or regulated by this chapter, with other merchandise or stock in his place of business, *shall be deemed to have the same in his possession for sale.*" This section in no way attempts to define " expose for sale " nor does it affect the definition of that term as laid down in the *Lewis* case.

The language in the case of *People* v. *Lewis* holding that " exposure for sale " means " having in stock," in my opinion is both binding from the viewpoint of law and sound reasoning.

In the case of *Commonwealth* v. *Hana* (195 Mass. at pp. 263, 264) the court held that a peddler in possession of a valise of merchandise, which valise was never opened, was nevertheless guilty of " exposing for sale " the merchandise in the valise when attempting to interest a prospective customer who refused to look at the merchandise. Chief Judge KNOWLTON, in that opinion, stated: " The expression ' exposed for sale ' is a well-understood term, and cannot be limited so as to mean only ' exposed to view.' We think that the words ' exposing for sale ' in the statute before us are satisfied if a peddler has with him in his hands in the presence of one who he solicits to buy, goods which he refers to in his conversation as contained in a receptacle that he is carrying, which goods he offers to exhibit for the purpose of making a sale, even though they are at the time concealed from view by the receptacle that contains them. The jury were warranted in finding the goods were exposed for sale."

HISCOCK, J. (later chief judge), in *People* v. *Hills* (64 App. Div.

584), in construing a statute forbidding the " exposing and offering for sale " of adulterated milk and cream, said (p. 586): " It is true that no one saw the defendant through this driver upon this occasion, sell or offer for sale, any of this cream. But there was evidence, abundantly justifying the conclusion that it was his business so to do. All of the surrounding circumstances indicated that that was the business in hand at this time. No apparent object was disclosed for carting the cream through the streets of Rochester at this time in the morning for any other purpose, and we are unable to conclude that a jury would have overstepped its powers in finding that the cream was being peddled or offered for sale." (See, also, *People* v. *Koch*, 19 Misc. 634.)

Possession in and of itself is not exposure for sale. Possession under the circumstances disclosed in this case leads to the irresistible conclusion that the defendants possessed the meat in question as part of the stock of their business. Stock in trade, whether in the receiving or shipping department, in the icebox, on the shelf, in the showcase, or in the storeroom, is merchandise *exposed for sale.*

Under the facts in this case, there can be no other conclusion than that it was part of the stock and, therefore, *exposed for sale.*

The circumstances clearly establish an intention on the part of the defendants to defraud the consuming public by keeping in stock non-kosher meat to be sold as kosher.

If we are to limit the construction of *exposed for sale* to mean " exposed to view," we must come to the ridiculous conclusion that only the first row on the shelf of retail stores need comply with the adulteration laws, and similar statutes where the term " exposed for sale " is used; and that the second row, if judiciously hidden by the first, may be adulterated to any degree dictated by an avaricious vender's conscience.

To hold the words *exposed for sale* to mean *exposed to view*, rather than that exposure in violation of the statute consists in having the adulterated or misbranded article *in stock for the purpose of sale*, would nullify the intent of the Legislature.

Motion to dismiss denied and defendants held for the Court of Special Sessions.